## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| GREGORY LEE JOHNSON<br>3311 Mission Street, #127<br>San Francisco, CA 94110<br><br>     Plaintiff,<br><br>  vs.<br><br>THE CITY OF CLEVELAND<br>601 Lakeside Avenue, Room 106<br>Cleveland, OH 44113<br><br>MICHAEL McGRATH<br>CALVIN WILLIAMS<br>TIMOTHY GAERTNER<br>WILLIAM STANTON<br>JAMES BELLOMY<br>DONALD TAYLOR<br>(in their official and personal capacities)<br>c/o Department of Public Safety<br>601 Lakeside Avenue, Room 230<br>Cleveland, OH 44114<br><br>INFOWARS, LLC<br>100 Congress Avenue, 22nd Floor<br>Austin, TX 78701<br><br>ALEX JONES<br>15101 Back of the Moon Drive<br>Austin, TX 78734<br><br>JOSEPH BIGGS<br>6201 Sneed Ct., Apt. 217<br>Austin, TX 78744<br><br>JORDAN SALKIN<br>1433 Abelia<br>Irvine, CA 92606<br><br>  -and-<br><br>JOHN DOES 1-6<br>(in their official and personal capacities)<br><br>     Defendants. | Case No.<br><br>Judge<br><br>Magistrate Judge |

### FIRST AMENDED COMPLAINT WITH JURY DEMAND

## NATURE OF THE ACTION

1.      This case arises from an extraordinary breakdown of the rule of law in Cleveland.

2.      High-schoolers know that burning the American flag is symbolic speech protected by the First Amendment.[1] They know because the Plaintiff, Gregory Lee Johnson, did so at the Republican National Convention in 1984. The Supreme Court's landmark declaration of his right, and the "bedrock" constitutional principle it represents, is so fundamental to our highest law to be curricular.

3.      The City of Cleveland ignored that lesson when it hosted the Republican National Convention in 2016 and arrested Mr. Johnson for burning a flag. Through its police force and prosecutors (who swear to uphold the Constitution), and assisted by all-too-willing extremists (who believe physical assault on flag-burners is their patriotic duty), the City censored Mr. Johnson and retaliated against him for exercising the same First Amendment freedom to burn an American flag, under the same circumstances the Supreme Court declared was *his* right nearly 30 years ago.

4.      The City knew he was *that* Johnson. The one who burned the flag. He announced his plan in advance with a press release and media advisory, and the City detailed undercover officers to follow him to the designated free-speech zone he announced would be the site of his protest.

5.      But the officers did not perform their constitutional duty to protect Mr. Johnson's peaceful expression—a duty the City's police chief would concede and admit knowing. Nor were they adequately—or at all—trained on mandatory First Amendment constraints on policing the protected speech they knew would arise, despite the millions of dollars the City spent quartering troops at Cleveland universities and implementing comprehensive law enforcement protocols.

---

[1] *Texas v. Johnson,* 491 U.S. 397 (1989); *see also* United States Courts, *Educational Resources, available at* http://www.uscourts.gov/educational-resources/educational-activities/texas-v-johnson (providing educational resources for instructing high-school students on *Texas v. Johnson*).

6.      Instead, and consistent with a decades-old, force-wide tradition of disdain for the First Amendment rights of flag-burners, the City only took measures to shut him down. Assisted by federal law-enforcement officials, its police officers surveilled RevCom, the protest group that formed a protective circle around Mr. Johnson so that he could safely burn his flag. The officers broke that circle even before Mr. Johnson began to light the flag, lunging at him to prevent him from burning it, and deploying "cold fire" from fire extinguishers the moment its corner lit. They literally extinguished his speech. Then they dragged him to the ground where, prone and compliant, he was kicked and punched by the very men the City would charge him with assaulting.

7.      The City did not charge *them* with assault, though it had amble video evidence, including one of his assailants' body-camera footage (which conveniently disappeared, irretrievably, when Mr. Johnson's criminal-defense counsel asked for it) and their self-published YouTube braggadocio in which they not only confessed to assaulting *him*, but pronounced their criminal acts valorous and patriotic. Instead, the City carted Mr. Johnson off to jail and held him without charge for 24 hours with feeble excuses about locked courtrooms until the salient period for their protest had expired. The City successfully silenced protected speech directed at the Trump campaign's aggressive nationalism, taking lawful protesters off the board during days three and four of the Convention, when now-President Trump delivered his address, distorting the public conversation about the man who became President through the strategic use of force.

8.      The City and its officers needed that time to find a something to charge Mr. Johnson with, because the "desecration" charge one of its officers scrawled on an arrest board had been declared unconstitutional as a result of the very man they held in jail. So the City enlisted the all-too-willing "patriots" to justify its arrest, accepting fraudulent medical reports to bolster the retaliatory charge for which it prosecuted him: misdemeanor assault on two members of the "media."

9.      Ample and contemporaneously available video captured the unlawfulness of the arrest. But the City did not release him, because continuing to silence Mr. Johnson's famous protest served interests the City prioritized over his First Amendment rights. As the City was acutely aware, the RNC put Cleveland on the world stage, and the City was powerfully motivated to be seen as a capable host for a seamless convention. So it kept him incarcerated as long as it could.

10.     While its officers scrambled to find something to charge, drafting and discarding report after report, the City took to the press. Defendant Williams convened two press conferences to defend his officers' unlawful actions, untroubled by any rebuttal from his prominent detainee. The Division of Police's hyperactive Twitter account, which had promised Mr. Johnson would be met with fire suppressants before his protest began, applauded the officers.

11.     For their part, the self-styled reporters from InfoWars proclaimed victory over communism from a local bar, basking in adulation and anticipated profits from the consumers of hateful rhetoric (and snake-oil supplements) that constitute their audience:

> I ripped the guy's shirt off and just punched him and kicked him man. You know what, I'm a fucking veteran. My buddies died for this country and you're going to burn this flag in front of me? Screw you; it's not going to happen. So we just did everything we could. . . .

> Well, now I'm going to go and submit this in and then go after Revcom because these guys are un-American bastards. And this is America and we are here to defeat communism. Revcom for prison!

12.     The day after the InfoWars video was published, the City informed Mr. Johnson that *he* would be charged for assaulting *them.* And it pursued that charge against Mr. Johnson for nearly six months, declining to dismiss it in light of the InfoWars confession, claiming to have mislaid the body-camera footage it obtained from Defendant Biggs. (Conspicuously, Biggs, a prolific vlogger who produced a virtually uninterrupted video-stream of his antics, never posted it himself.)

13.     The City continued to prosecute Mr. Johnson over the ensuing politically charged months, which saw the election of President Trump and his declaration that flag-burners should be jailed. Mr. Johnson suffered the distress and injustice of the Trumped-up charge until it was finally (and voluntarily) dismissed on January 11, 2017, just before Trump's inauguration.

14.     Mr. Johnson's persecution in Cleveland was no patrolman's error. It was ratified by the City's continuing retaliation against him. And it represents a calculated assault on the rule of law; the culmination of a decades-old practice by Cleveland police officers to seek unlawful convictions on the basis of "unpatriotic" symbolic speech.

15.     By this civil-rights action, brought under 42 U.S.C. § 1983 and Ohio law, Mr. Johnson seeks to hold the City of Cleveland, its police officers, and their co-conspirators responsible for violating the constitutional right the Supreme Court guaranteed him, and vindicate his First Amendment freedom to protest the American government by burning its flag.

## PARTIES

16.     Plaintiff Gregory Lee Johnson is a resident of San Francisco, California, and was the named defendant in *Texas v. Johnson.*

17.     Defendant City of Cleveland (the "City") is a municipal corporation under Article XVIII of the Ohio Constitution, and a "person" subject to suit within the meaning of 42 U.S.C. § 1983. The City operates and supervises the Department of Public Safety ("DPS"), which includes the Division of Police (the "Division").

18.     Defendant Michael McGrath is the Director of the Cleveland Department of Public Safety, and a former Cleveland Chief of Police. At all relevant times, he acted under color of state law and in his official capacity. He is sued in both his official and personal capacities.

19.     Defendant Calvin Williams is the City's Chief of Police. At all relevant times, he acted under color of state law and in his official capacity. He is sued in both his official and personal capacities.

20.     Defendant Timothy Gaertner is a Cleveland police officer. At all relevant times, he acted under color of state law and in his official capacity. He is sued in both his official and personal capacities.

21.     Defendant William Stanton is a Cleveland police officer. At all relevant times, he acted under color of state law and in his official capacity. He is sued in both his official and personal capacities.

22.     Defendant James Bellomy is a Cleveland police officer. At all relevant times, he acted under color of state law and in his official capacity. He is sued in both his official and personal capacities. (Defendants Gaertner, Stanton, and Bellomy are the "City Defendants.").

23.     Defendant Donald Taylor is a Cleveland police officer. At all relevant times, he acted under color of state law and in his official capacity. He is sued in both his official and personal capacities.

24.     Defendant John Doe 1 is a Cleveland police officer, and an authorized user of the Department's Twitter feed. At all relevant times, he acted under color of state law and in his official capacity. He is sued in both his official and personal capacities.

25.     Defendant John Doe 2 is a Cleveland police officer, and stated on police radio that flag burning is unlawful. At all relevant times, he acted under color of state law and in his official capacity. He is sued in both his official and personal capacities.

26.     Defendants John Does 3–5 are Cleveland police officers who conducted surveillance on the protest.  At all relevant times, they acted under color of state law and in their official capacity. They are sued in both their official and personal capacities.

27.     Defendant Alex Jones is a political extremist,[2] conspiracy theorist, and radio host who built a highly profitable media empire by selling "dietary supplements designed to prey on the paranoias and insecurities of his listeners" to an audience of white supremacists and American nationalists.[3] He is a resident of Texas.

28.     Defendant InfoWars, LLC is a Texas-based media company operated by Defendant Jones with an annual revenue of $10 million and a weekly audience of 2 million people. It operates an online website, Infowars.com, on which its employees, including Defendants Jones, Biggs, and Skalkin (with InfoWars, the "InfoWars Defendants"), propound violent and hateful rhetoric.

29.     Defendant Joseph Biggs is an American extremist and a former employee of InfoWars. He attended the RNC as an employee of InfoWars, and would be a leading proponent of the debunked "Pizzagate" conspiracy theory.[4] He is a resident of Texas.

---

[2] Southern Poverty Law Center, *Extremist Files: Alex Jones*, *available at* https://www.splcenter.org/fighting-hate/extremist-files/individual/alex-jones.

[3] Seth Brown, *Alex Jones's Media Empire Is a Machine Built to Sell Snake-Oil Diet Supplements*, (New York Magazine, May 4, 2017), *available at* http://nymag.com/selectall/2017/05/how-does-alex-jones-make-money.html.

[4] Defendant Jones claims that Biggs left to pursue other projects, and was not terminated for the ensuing scandal. Studious Dunce, *Alex Jones Explains WHY Joe Biggs NO LONGER at InfoWars @rambobiggs Not Fired, Not Pizzagate* (YouTube.com, Dec. 9, 2016), *available at* https://www.youtube.com/watch?v=CPQ3LOpcBOE.

30.    Defendant Jordan Salkin is an American extremist and an employee or agent of InfoWars during the RNC in Cleveland, which he attended at Defendant Jones' instruction.[5]  He is a resident of California.

### JURISDICTION AND VENUE

31.    Under 28 U.S.C. §§ 1331, 1343, and 2201, Mr. Johnson asserts jurisdiction over federal claims under 42 U.S.C. §§ 1983, 1985, and 1988, which provide for attorneys' fees in civil-rights claims. This Court has supplemental jurisdiction over Mr. Johnson's state-law claims under 28 U.S.C. § 1367.

32.    This Court has personal jurisdiction over the City Defendants, who reside in and conduct business in this District, and the InfoWars Defendants, who conducted business in this District. Venue is proper under 28 U.S.C. § 1391 because the events giving rise to Mr. Johnson's claims took place within this District.

### FACTUAL BACKGROUND

**The Supreme Court declares Mr. Johnson's First Amendment right to burn the American flag.**

33.    In 1984, Mr. Johnson attended the Republican National Convention in Dallas, Texas, to protest American capitalism and military imperialism he attributed to the Republican re-nominee, President Ronald Reagan, and symbolized by the American flag. Accompanied by a protest group, Mr. Johnson marched to City Hall, where he "unfurled the American flag, doused it with kerosene, and set it on fire."[6] He was then charged (and convicted) for his symbolic speech.

---

[5] Steven Nelson, *RNC Flag Burning Case Gets Messy as 'Victims' Identified* (U.S. News & World Report, Aug. 10, 2016), *available at* https://www.usnews.com/news/articles/2016-08-10/rnc-flag-burning-case-gets-messy-as-victims-identified.

[6] *Johnson*, 491 U.S. at 399.

34.     In 1989, the Supreme Court declared his conviction for flag-desecration unconstitutional. The Court rejected Texas's justification—preventing breaches of the peace—as backwards and insufficient, because protected expression must be able to "invite dispute" and "may indeed best serve its high purpose when it induces a condition of unrest . . . or even stirs people to anger."[7]

35.     Writing for the Court, Justice Brennan explained that interfering with Mr. Johnson's speech denigrated the principles for which the flag flew, including the "bedrock" principle that "the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable."[8]

36.     The Court therefore provided clear instructions for self-styled patriots who might encounter his speech: salute the flag; don't silence the speaker.

> We can imagine no more appropriate response to burning a flag than waving one's own, no better way to counter a flag burner's message than by saluting the flag that burns, no surer means of preserving the dignity even of the flag that burned than by—as one witness here did—according its remains a respectful burial. We do not consecrate the flag by punishing its desecration, for in doing so we dilute the freedom that this cherished emblem represents.[9]

**The Ohio Supreme Court repudiates Cleveland police for punishing protected speech.**

37.     In Cleveland, these instructions fell on deaf ears. As a series of court decisions recount, even in the wake of *Texas v. Johnson*, Cleveland police officers repeatedly attempted to interfere with symbolic burnings that challenged national or civic pride.

---

[7] *Id.* at 408.

[8] *Id.* at 414.

[9] *Id.* at 420.

38.   The first commenced the very next year, when Cleveland police officers arrested Cheryl Lessin, a supporter of the Revolutionary Communist Party who burned an American flag in Public Square to protest American militarism.[10]

39.   Past was already prologue.

> Someone from the crowd, apparently offended by the demonstrator's proposed actions, tried to pull the flag out of the demonstrator's hands and a tug of war over it ensued. While [the demonstrators] were trying to regain possession of the flag, they were also engaging members of the crowd in arguments about flag burning. Eventually, Lessin recovered the flag and burned it.[11]

40.   Thus began the City's attempts to find a work-around to punish "unpatriotic" speech. The City's police officers cited Ms. Lessin with inciting violence, and the state of Ohio convicted her.[12] But the Ohio Supreme Court reversed her conviction because shabby "patriotism" was not unique to opponents of flag-burning in Texas, and the jury was not adequately instructed on her First Amendment rights.[13] The Court's rationale speaks resoundingly to Mr. Johnson's ordeal: "Our decision rests in large part on our awareness of the depth of those personal convictions that consider flag desecration as a repugnant and intolerable act."[14]

### Cleveland police learn nothing.

41.   Those "personal convictions" were (and remain) widely held by Cleveland police officers. But even after *Johnson* and *Lessin*, the City did not train its officers on constitutional protections for symbolic burnings that challenge national or civic pride, or take measures to ensure that police action against protected speakers remained uncorrupted by those convictions.

---

[10] *State v. Lessin*, 620 N.E.2d 72, 73–74 (Ohio 1993).

[11] *Id.* at 74.

[12] *Id.* at 75.

[13] *Id.* at 79.

[14] *Id.*

42.     Instead, the City read *Lessin* as an invitation to effect censorship by other means, and tried a series of criminal charges on for size. In fact, *Lessin* would provide the framework (but not the facts) for the City's persecution of Mr. Johnson:

> While Lessin's right to verbally criticize her government's foreign policy and her right to burn the United States flag without urging people to commit violent acts can in no way form the basis of a conviction under R.C. 2917.01, Lessin's alleged assaults of passersby are not constitutionally protected from criminal sanction . . . [15]

43.     But the City did nothing in the interim to prevent its officers from unconstitutionally transmuting personal convictions into criminal charges. In 2001, Cleveland's former police chief Rocco Pollutro testified that the City had "no written or unwritten procedures to be followed in the case of public burnings," never "ordered instruction on probable cause in cases of public demonstrations or burnings," and could not recall ever disciplining or even reprimanding an officer for constitutional violations, either before or after a series of arrests in 1997 and 1999 for public burnings in protest of civic symbols.[16]

44.     In 1997, the City arrested demonstrators who burned an effigy of Chief Wahoo in a designated free-speech area on charges of disorderly conduct, criminal trespass, criminal endangering, and resisting arrest, claiming that the protest had damaged a tree.

45.     Those protesters were acquitted on April 7, 1999 on defense motions."[17] But three days later, the City tried again, arresting two of the same protestors for burning another effigy of Chief Wahoo. The City booked them on charges of aggravated arson and detained them overnight, but

---

[15] *Id.* at 77.

[16] Brief in opposition to Defendants City of Cleveland and Rocco Pollutro's Motion for Summary Judgment, *Bellecourt v. City of Cleveland et al.*, No. 381990, 2001 WL 34890955 (Ohio Ct. Cmn. Pl. Jan. 16, 2001) (summarizing then-Chief Pollutro's deposition testimony).

[17] *Id.*

"did not prosecute appellees for violating any law."[18] The arrestees' civil lawsuit reached the Ohio Supreme Court in 2004, which reminded the City that *Texas v. Johnson* was still the law of the land, and drew the legal line between policing bona fide public safety concerns (pouring lighter fluid on a burning effigy in windy conditions amidst agitated demonstrators), and effecting retaliatory arrests.[19]

### The Sixth Circuit forbids pretextual arrests on the basis of public safety.

46.     Ten years later, and the year before Mr. Johnson's arrest in Cleveland, the United States Court of Appeals for the Sixth Circuit Court sat *en banc* to admonish police officers against invoking public safety concerns about audience reactions as a basis to censor or punish speakers.[20] It addressed its unusual opinion in *Bible Believers* directly to police officers, even those not before it, reminding them that audience reactions do not immunize them from § 1983 liability, and reiterating the "substantive duties of a police officer not to effectuate a heckler's veto."[21]

47.     It was clearly established in 2015 that police officers have an affirmative First Amendment obligation to take reasonable measures to avoid effectuating a heckler's veto.

48.     It was clearly established far earlier that a core purpose of the freedom of speech "is to invite dispute," which is "protected against censorship or punishment" notwithstanding "public inconvenience, annoyance, or unrest," because "the alternative would lead to standardization of ideas either by legislatures, courts, or dominant political or community groups."[22]

---

[18] *Bellecourt v. Cleveland*, 820 N.E.2d 309, 311 (Ohio 2004) (affirming post-trial directed civil Section 1983 verdict for the City).

[19] *Bellecourt.*

[20] *Bible Believers v. Wayne County*, 805 F. 3d 228, 247–55 (6th Cir. 2015).

[21] *Id.* at 252; *Leonard v. Robinson*, 477 F.3d 347 (6th Cir. 2007).

[22] *Terminiello v. City of Chicago*, 337 U.S. 1, 4–5 (1949).

49.     The City knew the RNC created an unprecedented "dominant political group" in Cleveland, and faced a flood of attendees that overwhelmingly detested supposedly unpatriotic speech. But in its preparations for the RNC, the City provided no specific training to its police officers to prevent the imposition of a heckler's veto against dissenters' protected speech.

### The RNC comes to Cleveland.

50.     By the time the City successfully campaigned to host the RNC in 2016, the political atmosphere was ripe for another attempt to circumvent *Texas v. Johnson*. Donald Trump would be selected as the Republican nominee, and his campaign emphasized robust nationalism and promised strong support for law enforcement. His platforms were well-known and widely supported among Cleveland police officers, and he would soon garner full-throated endorsements from the Fraternal Order of Police and the Cleveland Police Patrolmen's Association.

51.     Political nationalism was at an apogee, and flag-burners, their constitutional rights notwithstanding, remained an object of scorn to police officers. Trump would tweet his disdain for *Texas v. Johnson* on November 29, 2016, claiming that flag-burners should be jailed. This sentiment was widely shared by police officers across the country, who saw flag-burning as an assault on police dignity and an insult to their sacrifices.[23] But it remained clear that police officers "may not base . . . probable-cause determination on speech protected by the First Amendment."[24]

52.     During the Convention, Cleveland was occupied by thousands of law-enforcement officials who shared these convictions. The City had received a $50-million federal grant to implement a

---

[23] Story Hinckley, *Why a Penn. man arrested for flag desecration was awarded $55,000* (Christian Science Monitor, July 22, 2016), *available at* https://www.csmonitor.com/USA/2016/0722/Why-a-Penn.-man-arrested-for-flag-desecration-was-awarded-55-000.

[24] *Swiecicki v. Delgado*, 463 F.3d 489, 498 (6th Cir. 2006).

sweeping police protocol for the RNC, and officers from the FBI, the Secret Service, the National Guard, and the Cleveland Division of Police patrolled the City.[25]

53.     With massive public resources at its disposal, the City bragged about its capacity to constitutionally police the RNC, and established "free-speech zones" for protestors to exercise their First Amendment rights, including the site where Mr. Johnson was arrested.

54.     According to the City's plan, "Anyone wishing to exercise their First Amendment rights will be able to do so and the City of Cleveland will assist them to ensure a safe environment."[26]

55.     Defendant Williams was responsible "for the direction, supervision, and management of all law enforcement officers" in designated free-speech areas.[27]

56.     But training police to protect protesters' First Amendment rights remained an afterthought. "The Goal of the City of Cleveland," it declared, "is to provide a safe and secure environment for all participants, news media, individuals exercising their First Amendment Rights, service providers, and the general public," but the $50 million procurement did not seek funding for any specific training on protecting the protected speech its officers loathed.[28]

57.     In Mr. Johnson's criminal prosecution, Defendant Williams was unable to articulate a single detail about First Amendment training provided to Cleveland police officers.

58.     Other Cleveland police officers have since testified under oath that, since the 1990s, they have not received First Amendment training of any sort.

---

[25] City of Cleveland Safety Preparedness Update ("the Security Plan"), attached as Exhibit 1.

[26] Id. at 12.

[27] *Id.* at 6.

[28] *Id.* at 48.

**Mr. Johnson comes to Cleveland.**

59.     The RNC celebrated the very platforms Mr. Johnson protested in Texas: American jingoism, exceptionalism, militarism, and imperialism.

60.     Mr. Johnson was, and remains, a supporter of the Revolutionary Communist Party. He believed, and continues to believe, that the American flag represents the capitalist, imperialist, and nationalist tendencies that his political philosophy abhors. He burned the flag to emphasize the non-partisan nature of his critique, and to protest the power structures it represented. As the Supreme Court recognized, the "expressive, overtly political nature" of his protected expression "was both intentional and overwhelmingly apparent," because "Johnson burned an American flag as part—indeed, as the culmination—of a political demonstration that coincided with the convening of the Republican Party and its renomination of Ronald Reagan for President."[29]

61.     More profoundly than Ronald Reagan's ever did, Candidate Trump's campaign espoused the principles that Mr. Johnson devoted his life to protesting. Trump's electoral brand was vigorously capitalist, avowedly nationalist ("Make America Great Again"), and stridently militarist.

62.     So Mr. Johnson came to Cleveland, along with members of the Revolution Club, who would assist him in the peaceful protest. He planned to burn a flag in a designated free-speech zone, just as he did in Texas, at the time candidate Trump was scheduled to take the RNC stage, and exercise his clearly established First Amendment right to speak in proximity, and in protest.

---

[29] *Johnson*, 491 U.S. at 406.

**The City surveils Mr. Johnson and prepares to arrest him.**

63. All of the Defendants were aware of his planned protest. The Revolution Club issued a press release declaring Mr. Johnson's intent to burn a flag at the free speech zone at the corner of East 4th Street and Prospect Avenue,[30] and the City's officers "were specifically made aware of the plan . . . for one single individual that was going to burn a flag at 4th and Prospect."[31]

64. As police reports drafted (and revised) while he was incarcerated reflect, the City was prepared to receive Mr. Johnson with handcuffs.

> Open source information was forwarded to officers working the crowd management detail warning that members of a group that identified themselves as "rev.com" were advertising a flag burning to take place at E. 4th and Prospect at 1600 hours.[32]

65. The City knew that protestors' right to choose the particular circumstances of a protest, including proximity to the object of their protest, is vital to the delivery of their message.[33] And the City knew that its officers had a duty to protect, not violate, Mr. Johnson's First Amendment rights. A recently adopted General Order stated that "The Cleveland Division of Police recognizes the right of free speech and assembly and shall actively protect people in the exercise of those rights."[34]

66. But the City did not train its officers on how to protect Mr. Johnson's disfavored speech from interference before the RNC.

67. Mere months later, when he testified under oath in related criminal prosecutions arising from Mr. Johnson's protest, Defendant Williams claimed that extensive classroom training had

---

[30] E.g. Testimony of Calvin Williams, *Transcript, Motion to Dismiss Hearing, Cleveland v. Arrant et al.,* No. 2016-CRB-013733, at 58:2–59:22 (Cleveland Mun. Ct. Jan. 26, 2017). A copy of this transcript (the "MTD Transcript") is attached as Exhibit 2.

[31] MTD Tr. at 39:23–40:4.

[32] Gaertner Field Report, attached as Exhibit 3.

[33] *E.g.* MTD Tr. at 28:7–12; 32:21–33:5.

[34] MTD Tr. at 25.

been provided on policing protests, but was unable to recall a single specific training provided to officers about the First Amendment rights of protestors.[33] He did not identify a single instance of training on symbolic speech or flag-burning.

68. And the only portion of the training materials entitled "Crowd Management and [t]he Protection of Constitutional Rights" to which the Chief referred that could conceivably provide guidance to officers confronting symbolic flag-burning was buried in a single page of a voluminous PowerPoint presentation. And it suggested police officers should provide no protection whatsoever.

69. Instead, the lonely training slide (depicted below) instructed Cleveland police officers to remain vigilant and immediately extinguish symbolic speech. Titled "Officer and Crowd Engagement," the slide instructed City personnel to "be vigilant for activities such as burning of objects," and directed them, "at the first sigh of such activity," to "deploy a quick response plan to immediately address the activity including extinguishing any fires:



### VII. Officer and Crowd Engagement

- *Fires or burning objects*
  - *officers and supervisors shall be vigilant for activities such as burning of objects*
  - *At the first sign of such activity*
    - *IC or Field Commander (FC) should be notified*
    - *IC or FC shall deploy a quick response plan to immediately address the activity*
    - *including extinguishing any fires*

---

[33] MTD Tr. at 35:10–22.

70.     None of the RNC training given to the City's officers adequately provided guidance (or motivation) to conform their conduct to the First Amendment, or abstain from unconstitutional retaliation against the content of Mr. Johnson's protected expression.

71.     The overwhelming focus of the City's efforts were preventive, not speech-protective. The City developed a sweeping safety protocol that outlined a multi-agency, state/federal law-enforcement apparatus, including plans for swiftly processing mass arrests, mobile medical units, and extensive surveillance and anti-terror capabilities.[36] It had the capacity, if it chose, to swiftly process and release arrested protestors so that they could continue to exercise their First Amendment rights.[37]

72.     In the weeks leading up to the Convention, the City, along with its federal law-enforcement partners, including the FBI and the Secret Service, had conducted door-knocks of persons suspected of potential dissident activity. On information and belief, the City researched Mr. Johnson, the Revolution Club, and the Revolutionary Communist Party, and the Division of Police discussed them internally and, upon information and belief, with the FBI and the Secret Service.[38]

73.     Accordingly, the City briefed and detailed police officers to investigate Mr. Johnson, identify him when he arrived, and attend his protest. The City dispatched undercover officers to identify and tail Mr. Johnson to the designated free-speech zone. As Defendant Gaertner would testify, the purpose of following Mr. Johnson was "to monitor his activities."[39]

---

[36] Ex. 1.

[37] *E.g.* George Zornick, *Why Are People Arrested at the RNC Still InJail?* (The Nation, July 21, 2016), available at https://www.thenation.com/article/why-are-detained-rnc-protestors-still-in-jail/.

[38] MTD Tr. 47:24–48:14.

[39] MTD. Tr. 85:21-23.

74.     The City knew, or had reason to believe, that these officers opposed Mr. Johnson's speech on the basis of its content. And they did. Through its official Twitter account, the Division of Police indicated its disdain for Mr. Johnson's speech, repeatedly promising its followers—with a dismissive exclamation point—that Cleveland would "take care of that!"



75.     Defendant Gaertner was among the officers who tailed Mr. Johnson to the free-speech zone. He asked, and was falsely advised by John Doe 2 on police radio shortly before he arrested Mr. Johnson, that burning a flag was a crime.[40] As he testified under oath, he was "warned by the radio that [Mr. Johnson and his protest group] were advertising a flag burning to take place," and he "made note of the fact that open flames and burning of any sort were prohibited."[41]

---

[40] MTD Tr. 42:21–43:12.

[41] MTD Tr. 86:9–21.

**InfoWars comes to Cleveland to obstruct Mr. Johnson's protest.**

76.     By this time, InfoWars representatives had arrived in Cleveland and were preparing to obstruct Mr. Johnson's protest. The RNC represented a golden opportunity for InfoWars to amplify its message and profits. By the time the RNC was convened, American political nationalism was at an apogee, and InfoWars prospered. Then-candidate Trump showered Defendant Jones with praise in December 2015, praising his "amazing reputation" in an appearance on Defendant Jones' radio show.[42]

77.     Defendants Jones, Biggs, and Salkin attended the RNC as representatives of InfoWars. The InfoWars Defendants were aware that Mr. Johnson planned to burn an American flag, and Defendant Jones specifically instructed Defendants Biggs and Salkin to follow him.[43] As Defendant Biggs would recount later that day, their motives were preventive and retaliatory, and he declared that if someone plans to burn a flag, "we're coming after you."[44]

78.     Defendants Biggs and Salkin followed Mr. Johnson to the designated free-speech area and muscled their way close to him.

**The City censors Mr. Johnson.**

79.     After he arrived at the free-speech zone, Mr. Johnson was peacefully encircled by fellow protesters. As they had practiced, they created a "safety circle" in which Mr. Johnson had room to safely light his flag, and, led by Mr. Johnson, began to chant in opposition to American militarism.

---

[42] David Corn, *Here's the Alex Jones Story Megyn Kelly and Other Reporters Should Probe* (Mother Jones, June 13, 2017), *available at* http://www.motherjones.com/politics/2017/06/alex-jones-megyn-kelly-donald-trump/.

[43] Ron Gibson, 2016 Republican National Convention - Joe Biggs Burned By Commies At Flag Burning, YouTube (July 20, 2016), https://www.youtube.com/watch?v=JFLlybksEwc, at 0:04. ("I knew the commies would attack me again after yesterday, so I just said, 'You guys just go.'").

[44] Gibson at 3:10.

80.     Once Mr. Johnson began speaking at the Protected Zone, the City's police officers engineered their own disturbance.

81.     Defendant Bellomy broke the "safety circle" even before the flag was lit, lunging at Mr. Johnson over several protestors who were protecting the safe ignition of the flag, and flailing to impose a chokehold.

82.     As video evidence demonstrates, and as he would testify under oath, Defendants Gaertner and Stanton, having just been falsely advised that flag-burning was a crime, immediately deployed a fire extinguisher against Mr. Johnson the moment the flag was lit.

83.     They did so pre-emptively, before any safety concern reasonably existed. As Defendant Gaertner wrote in a police report, "As soon as they began to light an American flag on fire, Lt. Gaertner and Sgt. William Stanton used 'cold fire' to extinguish the flame."[45]

84.     To set up the unlawful arrest he knew and intended the City would effect, Defendant Gaertner made his record, shouting "You're on fire, stupid!"

85.     Virtually everyone present was recording the protest on their smartphones. Ample video evidence confirms that there was no lawful basis for any the City defendants to interfere with Mr. Johnson's speech. Mr. Johnson was never on fire (nor is he stupid), and no lawful basis existed for any reasonable police officer to believe there was probable cause to arrest him. Defendants Gaertner, Stanton, and Bellomy were solely motivated to stop Mr. Johnson from burning the flag—that is, from engaging in First-Amendment protected symbolic speech.

**InfoWars assaults Mr. Johnson and lies to the police.**

86.     Police officers grabbed Mr. Johnson and forcibly dragged him to the ground. These included Defendant Bellomy, who released his choke-hold once Mr. Johnson was prone.

---

[45] Ex. 3.

87. Mr. Johnson never assaulted the InfoWars Defendants. Ample video evidence confirms as much. InfoWars' own footage would have as well, had it not suspiciously disappeared from police lockup, which explains why InfoWars never released it, or any depiction of any injury its representatives allegedly sustained, with its other self-congratulatory videos. And the City Defendants had no reasonable basis to believe he did.

88. Rather, as InfoWars itself confirmed, Mr. Johnson was assaulted while prone by Defendant Biggs. Motivated by his perverse version of "patriotism," he assaulted Mr. Johnson and attempted to grab the flag, shouting "that's my flag." As he would brag shortly after the incident,

> We were trying to get [the flag] out. I ripped the guy's shirt off and just punched him and kicked him man. You know what I'm a fucking veteran. My buddies died for this country and you're going to burn this flag in front of me? Screw you; it's not going to happen. So we just did everything we could. He [Salkin] was just holding on to me, trying to keep me from being sucked in there and being mixed in with those guys that were getting arrested. Then they started shooting peppers spray and then the flag came across and hit my hand and got hit because he was grabbing me from here trying to pull me back.[46]

89. After speaking with police officers, Defendant Biggs conspired with Defendant Salkin and the City Defendants to submit a false report about injuries his claimed injuries, and retaliate against Mr. Johnson for burning the flag.

90. Defendants Salkin and Biggs went to a field medic station operated by the City, and then drove themselves to St. Vincent's hospital after they were released.

91. At no point did the prolific vloggers publish footage of the injuries they touted. And such direct body-camera evidence as there may have been has mysteriously "disappeared." On information and belief, Defendants Salkin and Biggs self-inflicted burn wounds before presenting

---

[46] Gibson at 1:30.

themselves at the hospital, or simply presented themselves at the hospital and lied about having been burned.

92.     As Defendant Biggs would recount on YouTube on the evening of the arrests, the medical staff at St. Vincent's supported their cause. The treating personnel were "very glad to see" them, and they included details about their supposed heroism on the ensuing medical reports.

93.     On information and belief, Defendants Salkin and Biggs engaged numerous medical personnel, including Emergency Medical Technicians employed by the City, as well as treating staff at St. Vincent's, in discussions about their actions, which they considered heroic.

94.     Defendants Salkin and Biggs provided false oral reports to medical and law-enforcement personnel, including persons employed by the City, and on written documents they would submit to the City, to induce the City to prosecute Mr. Johnson.

95.     They then returned to a Cleveland bar with the fraudulent medical reports they obtained, where they recorded and published an InfoWars broadcast with Defendant Jones, explaining their conspiracy to get Mr. Johnson arrested.

> Well, now I'm going to go and submit this in and then go after Revcom because these guys are un-American bastards. And this is America and we are here to defeat communism. Revcom for prison![47]

96.     Defendants Biggs and Salkin then submitted false medical reports to Cleveland police officers to assist in the City's retaliation against Mr. Johnson, and to induce them to charge and prosecute him.

**The City detains Mr. Johnson to prevent him from continuing his protest.**

97.     The City deployed enormous resources to police the RNC, but used them to silence and restrain Mr. Johnson, not protect his speech or expeditiously process his arrest.

---

[47] Gibson at 3:24.

98.     The City immediately arrested him, took him into custody, and held him for 24 hours while it scrambled to identify a legal basis to justify his arrest. It did not attempt to verify the alleged self-immolation in which Mr. Johnson had supposedly engaged and that it was then using to justify Mr. Johnson's arrest. Instead, the City held Mr. Johnson as long as it could—through day four of the Convention—as it explored a series of bogus charges in drafted—and discarded—police reports.

99.     And it did not stop with Mr. Johnson. It swept up all of his fellow protestors, arresting them on assorted charges it would likewise gin up during their unnecessarily prolonged detention. All of those charges, like the sham assault charge the City brought against Mr. Johnson, were ultimately dismissed as a matter of law.

100.    But by detaining Mr. Johnson and as much of his protest group as it could round up, the City terminated his lawful protest, and thwarted his proximity to its object during the most important days of the Convention, and at the very moment his speech was most salient.

### The police declare victory.

101.    The Division of Police promptly bragged about its interference with Mr. Johnson's speech in tone-deaf social-media posts that trivialized the importance of the very speech the Supreme Court held dear. The Division's spokeswoman, Sgt. Jennifer Ciaccia, breathlessly declared the site of Mr. Johnson's censorship "a crime scene," posting a live video of her commentary on Twitter:

> We're live at East 4th and Prospect where a large protest was just disbursed. We had arrived over here a short time ago and there was a demonstration in progress. We had some information that it was possibly a flag-burning demonstration. Cleveland firefighters did arrive on scene and they extinguished a[n] American flag that protestors were burning; you can see the remnants of it just right over here. So this area has been declared a crime scene and all media has [*sic*] been asked to clear the area...[48]

---

[48] Jennifer Ciaccia, *Live Update E. 4/Prospect #RNCinfo* (Twitter, July 20, 2016, 4:48 pm), *available at* https://twitter.com/CLEpolice/status/755866897107812352).

102.    And she heralded the City's "success" online for the Division's followers to "like":



It proved to be a popular post.

**The officers hunt for a charge, and draft false and misleading reports.**

103.    The City's assault charge against Mr. Johnson was a sham. His arresting officers had no

cause to believe any crime had been committed, and only identified it only after a desperate race to

find one that might best permit them to save face for his unlawful detention.

104.    On the evening of Mr. Johnson's arrest, Defendant Chief Calvin Williams stood before reporters and falsely claimed that Mr. Johnson had set himself on fire, admitting that Mr. Johnson's conduct was otherwise lawful:

> Reporter:    If they hadn't set themselves on fire, they were just going to be allowed to burn the flag, and that was it?'

> Williams:    It's not against the law.

105.    But simultaneously, his (in)subordinate police officers cast rifled through theories of criminal liability, and settled upon false reports obtained from InfoWars, because their self-immolation excuse for Mr. Johnson's arrest had gone up in smoke.

106.    In the 24 hours Mr. Johnson remained in lockup, the City's police officers prepared, but did not pursue, reports seeking charges for resisting arrest, ORC 615.08, aggravated arson, ORC 2909.02, and disorderly conduct, ORC 605.03.

107.    While Mr. Johnson was incarcerated, the officers filed a series of false or misleading reports intended to induce his criminal prosecution. None of these reports disclosed the assault on Mr. Johnson by the InfoWars employees, even though they referenced the supposed burns of the supposed "media members" to justify their actions, and had sufficient interaction with, and obtained enough evidence directly from Defendant Biggs and yet another InfoWars employee, to warrant more meaningful inquiry. But if that inquiry were ever conducted, it was not disclosed: none of the reports describe the contents of the body-camera footage the City obtained from the InfoWars defendants while Mr. Johnson was incarcerated.

108.    In another written report, Defendant Taylor described obtaining that footage. He stated that he and another officer spoke with Defendant Biggs, instructed him to download the raw footage to a flash-drive supplied by the Fire Investigation Unit, and later went to retrieve the flash drive from Defendant Biggs and Rob Dew, an InfoWars employee and media specialist.

Defendant Taylor entered the drive into evidence, and stated that it was "stored in the Fire Arson video evidence locker."

109.    On information and belief, Defendant Biggs' body-camera footage establishes the absence of any probable cause to arrest Mr. Johnson or charge him with assault. Yet its contents were never acknowledged or discussed in the written reports.

110.    Defendants Biggs and Salkin also submitted written reports on the flash drive. On information and belief, those written reports were intended to induce the City to prosecute and convict Mr. Johnson, and contained false and misleading statements. But they, too, disappeared with the flash drive.

111.    In one of his reports, Defendant Gaertner stated that "open flames and burning of any sort" were unlawful. He knew, or would have known if he had been adequately trained, that this statement was false.

112.    Defendant Gaertner also reported that "Johnson and Castanon were continuously, before and after [the burning], calling for the other [sic] throw of the government during their arrests inciting the crowd to commit other acts of violence." He consciously mischaracterized Mr. Johnson's speech and knew, or should have known, that there was no incitement, for which Mr. Johnson was never charged.

113.    Defendant Gaertner also reported that "Two civilian media members were burned as the result of the recklessness of Johnson," accepting the conspicuously unsupported account provided by Defendants Biggs and Salkin, and without mentioning their assault, their animus for Mr. Johnson, or disclosing that it was through their aggressive attempt to capture Mr. Johnson's flag that they came anywhere near him.

114.    Defendant Gaertner stated in another report that Mr. Johnson "was advised by Commander Hefforen to disperse and leave the area."[49] Mr. Johnson received no such order, as Defendant Gaertner knew. Defendant Bellomy tackled Mr. Johnson before any dispersal order was issued, and placed him immediately into custody.

115.    In the report that the City included with its probable-cause affidavit, Defendant Bellomy stated as follows:

> On 7-20-2016, at approx. 1620 hours, I had the occasion to arrest Gregory Johson on DC/Resisting Arrest. A/M [Arrested Male] recklessly cause [sic] inconvenience, annoyance, or alarm to another by creating a risk of physical harm to others by burning a flag in a crowded area and did resist arrest numerous times in an attempt to escape detention. Did actively resist arrest by pushing/pulling from Officer after being told he was under arrest.[50]

116.    But Defendant Bellomy stated in another report that he attempted to "evacuate" Mr. Johnson from the "safety circle" "so I could better assess his condition and extinguish the flames."[51] In any event, ample video evidence demonstrates that Defendant Bellomy broke the safety circle before the flag was meaningfully lit, and bore Mr. Johnson to the ground, but Defendant Bellomy made no mention of the InfoWars assault, or the choke-hold he effected.

117.    The City also explored a charge for "flag desecration" against one of Mr. Johnson's fellow protesters, but did not charge her.[52]

118.    Nonetheless, despite ample reason to disbelieve the InfoWars Defendants' false accounts, and relying on the false or misleading reports its officers provided, the City decided to charge Mr. Johnson with misdemeanor assault on "media members."[53]

---

[49] Gaertner LERMS Data Card, attached as Exhibit 4.

[50] Bellomy Probable Cause Affidavit, attached as Exhibit 5.

[51] Bellomy Field Report, attached as Exhibit 6.

[52] MTD Tr. 43:13–45:13.

[53] Taylor Probable Cause Affidavit, attached as Exhibit 7.

119.    On July 21, 2016, Defendant Taylor signed a complaint charging Mr. Johnson with a single count of assault, ORC 2903.13, alleging that Mr. Johnson "did light a flag on fire and recklessly cause two people to receive burns."[54] In a report supporting that charge, Officer Donald Taylor wrote that Mr. Johnson was arrested because, "while protesting and burning the United States flag, Gregory Johnson caused two media members to get burned by the fire."

The City crafts its narrative.

120.    While its detainee remained silenced, the City spoke. Defendant Williams held at least two press conferences to justify the arrests on the grounds of public safety. But as the City publicly clothed its officers' naked censorship with the banner of public safety, its lawyers privately reread *Texas v. Johnson* to find a work-around for Mr. Johnson. When they did so, they encountered, or would have encountered with reasonable diligence, equally clearly established law that prohibits exactly what the officers, in concert with InfoWars and its instigators, did: instigating a public disturbance, and enforcing an unlawful heckler's veto.

121.    The Division of Police had been more forthcoming. On July 20, 2017, the Division published a Tweet stating that the City had "extinguished and took the flag that protestors attempted to destroy."[55]

**The assault charge unravels, but the City refuses to abandon it and ratifies its officers' actions.**

122.    Even after the InfoWars "reporters" confessed their unlawful assault on Mr. Johnson and their own ill motives, the City did not abandon its prosecution for months, leaving Mr. Johnson's liberty in jeopardy for months.

---

[54] Taylor Complaint, attached as Exhibit 8.

[55] MTD Tr. 46:21-24.

123.    As the prosecution continued, the City had no reasonable basis to believe that Mr. Johnson had assaulted the InfoWars Defendants.

124.    On information and belief, the body-camera footage that the City claims to have obtained from Defendant Biggs, and then supposedly "misplaced," confirms that Mr. Johnson did not assault Defendant Biggs. On November 4, 2016, the City's Chief Assistant Prosecutor, Kimberly Barnett-Mills, wrote to Mr. Johnson's defense counsel, stating that "[t]he flash drive with the video and the written statements were inadvertently misplaced. We have done an extensive search and have not found either the flash drive or the written statements." She did not explain how the flash drive could have disappeared from an evidence locker, or square her account with Chief Williams' statement at a press conference that the body-camera video had been archived, or mention whether any investigation into its unlawful removal had been conducted.

125.    Through counsel, Mr. Johnson repeatedly apprised the City that the InfoWars Defendants had admitted assaulting him, but the City failed to dismiss the charge until January 11, 2017.

126.    Even after dismissal, the City ratified the unconstitutional actions of its officers, who continued to proffer false, misleading, or inconsistent evidence and testimony. At a hearing on a motion to dismiss misdemeanor charges against a number of Mr. Johnson's fellow protestors, Defendant Gaertner testified about shouting "you're on fire, stupid," but claimed that his remark was directed to protestors, not Mr. Johnson.[36]

127.    Those charges were dismissed as well, on October 24, 2017. Judge Patton, who presided over the City's failed prosecution of all 16 individuals involved in the flag-burning, explained that

---

[36] MTD Tr. 96:2-97:8.

"[i]t looked like they were doing a peaceful protest," and understood that Mr. Johnson "was doing what he did, and the Supreme Court said he could do it."[57]

128.    On information and belief, the City has not taken any corrective measures in response to the constitutional violations its officers effected, either by disciplining or training them, and has continued its seizure of Mr. Johnson's flag to the present day.

## CAUSES OF ACTION (FEDERAL)

### CLAIM 1
### FIRST AMENDMENT RETALIATION, 42 U.S.C. § 1983—PRIOR RESTRAINT
### (AGAINST THE CITY DEFENDANTS AND THE CITY OF CLEVELAND)

129.    Plaintiff incorporates all previous allegations.

130.    It is "well-established that a public official's retaliation against an individual exercising his or her First Amendment rights is a violation of § 1983."[58]

131.    At all material times, Mr. Johnson was engaged in constitutionally protected activity, exercising his clearly established First Amendment rights to peacefully criticize the government through lawful and symbolic speech.

132.    Defendants effected an unlawful prior restraint on Mr. Johnson by extinguishing his symbolic speech, creating a physical confrontation, effecting and enforcing an unlawful heckler's veto, arresting him, and detaining him.

---

[57] Matt Pearce, *Protesters who burned the U.S. flag at 2016 Republican convention were wrongly charged, judge says* (Los Angeles Times Oct. 24, 2017), *available at* http://www.latimes.com/nation/la-na-flag-burning-20171024-story.html.

[58] *Barrett*, 130 F.3d at 264.

133.    Defendants' adverse actions injured Mr. Johnson by restraining, preventing, and impairing his lawful speech in a way likely to chill a person of ordinary firmness from propounding further lawful speech.[59]

134.    Defendants' adverse actions directly prevented him from continuing to engage in his fully protected constitutional activity in the time and manner of his choosing.

135.    Defendants were motivated to take these adverse actions in whole or in part because of the content of Mr. Johnson's constitutionally protected speech.

136.    Defendants' adverse actions violated Mr. Johnson's clearly established First and Fourteenth Amendment rights in light of clearly established law, including *Texas v. Johnson*.

137.    No reasonable person would have believed otherwise, given the state of the law and Defendants' motivations.

138.    Defendants' actions violate the First and Fourteenth Amendments via 42 U.S.C. § 1983.

139.    As a direct and proximate result of Defendants' unlawful activity, Plaintiff has suffered and continues to suffer economic and non-economic damages for which Defendants are liable.

140.    Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter Defendants and others from engaging in this type of unlawful conduct.

## CLAIM 2
### FIRST AMENDMENT RETALIATION, 42 U.S.C. § 1983—RETALIATORY ARREST
### (AGAINST THE CITY DEFENDANTS)

141.    Plaintiff incorporates all previous allegations.

142.    At all material times, Mr. Johnson was engaged in constitutionally protected activity, exercising his clearly established First Amendment rights to criticize the United States.

---

[59] *Reno v. ACLU*, 521 U.S. 844, 872 (1997) ("The severity of criminal sanctions may well cause speakers to remain silent rather than communicate even arguably unlawful words, ideas, and images.").

143.    Defendants arrested Mr. Johnson without probable cause in retaliation for exercising his clearly established right to protest the United States government by burning a flag.

144.    Defendants' retaliatory arrest injured Mr. Johnson by restraining, preventing, and impairing his right to protest in a way likely to chill a person of ordinary firmness from propounding further lawful criticisms.

145.    Defendants were motivated to execute the wrongful arrest by the content of Mr. Johnson's protected speech.

146.    Defendants' adverse actions violated Mr. Johnson's clearly established First and Fourteenth Amendment rights, and were unlawful in light of clearly established law. No reasonable person would have believed otherwise, given the state of the law and Defendants' motivations.

147.    As a direct and proximate result of Defendants' unlawful activity, Plaintiff has suffered and continues to suffer economic and non-economic damages for which Defendants are liable.

148.    Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter Defendants and others from engaging in this type of unlawful conduct.

### Claim 3
### Fourth Amendment Violation, 42 U.S.C. § 1983—Wrongful Arrest
### (Against the City Defendants)

149.    Plaintiff incorporates all previous allegations.

150.    "It is a well-settled principle of constitutional jurisprudence that an arrest without probable cause constitutes an unreasonable seizure in violation of the Fourth Amendment."[60]

151.     Defendants arrested Mr. Johnson because of the content of his speech.

---

[60] *Patrizi v. Huff*, 690 F.3d 459, 464 (6th Cir. 2012) (quoting *Ingram v. City of Columbus*, 185 F.3d 579, 592–93 (6th Cir. 1999)).

152.    Mr. Johnson had a Fourth and Fourteenth Amendment right to be free from wrongful arrest under the circumstances in which he was arrested.

153.    No officer could have reasonably believed there to be probable cause to arrest Mr. Johnson.

154.    Defendants' actions violate the Fourth and Fourteenth Amendments via 42 U.S.C. § 1983.

155.    As a direct and proximate result of Defendants' unlawful activity, Plaintiff has suffered and continues to suffer economic and non-economic damages for which Defendants are liable.

156.    Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter Defendants and others from engaging in this type of unlawful conduct.

### CLAIM 4
### FOURTH AMENDMENT RETALIATION, 42 U.S.C. § 1983—PROPERTY SEIZURE
### (AGAINST DEFENDANTS GAERTNER, STANTON, BELLOMY, AND THE CITY OF CLEVELAND)

157.    Plaintiff incorporates all previous allegations.

158.    Defendants' actions, including the seizure of Mr. Johnson's flag, constituted seizures within the meaning of the Fourth and Fourteenth Amendment.[61]

159.    Defendants' actions were unreasonable in light of the surrounding circumstances.

160.    No probable cause existed to seize the flag.

161.    No probable cause existed to retain the flag.

162.    Defendants' actions violate the Fourth and Fourteenth Amendments via 42 U.S.C. § 1983.

163.    As a direct and proximate result of Defendants' unlawful activity, Plaintiff has suffered and continues to suffer economic and non-economic damages for which Defendants are liable.

---

[61] "The Fourth Amendment protects against a seizure of property even if it occurs in a context in which privacy or liberty interests are not implicated." *Bonds v. Cox*, 20 F.3d 697, 702 (6th Cir. 1994).

164.    Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter Defendants and others from engaging in this type of unlawful conduct.

CLAIM 5
FOURTH AMENDMENT RETALIATION, 42 U.S.C. § 1983—PROPERTY RETENTION
(AGAINST THE CITY DEFENDANTS AND THE CITY OF CLEVELAND)

165.    Plaintiff incorporates all previous allegations.

166.    Defendants' actions, including the post-impoundment retention of Mr. Johnson's flag, constituted seizures and wrongful retentions of property under the Fourth and Fourteenth Amendments.[62]

167.    Defendants' actions were and are unreasonable in light of the surrounding circumstances.

168.    No probable cause existed or exists to retain Mr. Johnson's flag.

169.    Defendants continue to this day to unlawfully hold Mr. Johnson's flag, not only without probable cause, but knowing that all charges against him were dismissed.

170.    Defendants' actions violate the Fourth and Fourteenth Amendments via 42 U.S.C. § 1983.

171.    As a direct and proximate result of Defendants' unlawful activity, Plaintiff has suffered and continues to suffer economic and non-economic damages for which Defendants are liable.

172.    Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter Defendants and others from engaging in this type of unlawful conduct.

---

[62] *Bush v. Banks*, Nos. 95-6370, 96-5015, 1996 WL 668551 (6th Cir. Nov. 18, 1996).

## CLAIM 6
### FOURTH AMENDMENT VIOLATION, 42 U.S.C. § 1983—MALICIOUS PROSECUTION
### (AGAINST THE CITY DEFENDANTS)

173.    Plaintiff incorporates all previous allegations.

174.    "[T]he constitutional tort of malicious prosecution . . . is actionable in our circuit as a Fourth Amendment violation under § 1983."[63]

175.    Mr. Johnson was criminally prosecuted on sham assault charges for burning a flag.

176.    Defendants made, influenced, or participated in the decision to prosecute Mr. Johnson, including by falsifying evidence, drafting and submitting misleading investigative reports and affidavits, and omitting key and material facts.

177.    There was no probable cause for the criminal prosecution of Mr. Johnson.

178.    Mr. Johnson suffered a deprivation of his liberty and irreparable harm.

179.    The prosecution was resolved in his favor.

180.    Defendants' conduct violated the Fourth and Fourteenth Amendments.

181.    As a direct and proximate result of Defendants' unlawful activity, Plaintiff has suffered and continues to suffer economic and non-economic damages for which Defendants are liable.

182.    Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter Defendants and others from engaging in this type of unlawful conduct.

## CLAIM 7
### MUNICIPAL *MONELL* LIABILITY, 42 U.S.C. § 1983—AUTHORIZED ACTION
### (AGAINST THE CITY OF CLEVELAND)

183.    Plaintiff incorporates all previous allegations.

184.    The City and its designated policymakers for police practices, Defendants Williams and McGrath, failed to adequately train its officers and employees because of deliberate indifference to

---

[63] *King v. Harwood*, 852 F.3d 568, 584 (6th Cir. 2017).

the constitutional rights of protesters who challenge national or civic pride with protected symbolic burnings.[64]

185.    Chief Williams and Director McGrath were authorized to issue and implement official policy on criminal investigations and prosecutions by the City.

186.    No reasonable officer or attorney could believe that the actions Defendants took were lawful or permitted by the Constitution.

187.    The City is liable under the First, Fourth, and Fourteenth Amendments under 42 U.S.C. § 1983.

188.    As a direct and proximate result of the City's unlawful activity, Plaintiff has suffered and continues to suffer economic and non-economic damages for which the City is liable.

189.    The City's acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter the City and others from engaging in this type of unlawful conduct.

## CLAIM 8
### MUNICIPAL *MONELL* LIABILITY, 42 U.S.C. § 1983—UNCONSTITUTIONAL POLICY
### (AGAINST THE CITY OF CLEVELAND)

190.    Plaintiff incorporates all previous allegations.

191.    The City of Cleveland authorized and implemented an unconstitutional custom, policy, or practice of failing to protect protestors engaged in protected symbolic burnings that challenge national or civic pride.

192.    The City of Cleveland also authorized and implemented an unconstitutional policy of authorizing and instructing criminal investigations, arrests, and prosecutions to punish protestors engaged in protected symbolic burnings that challenge national or civic pride.

---

[64] *Canton v. Harris*, 489 U.S. 378, 392 (1989); *Haverstick Enterprises, Inc. v. Financial Federal Credit, Inc.*, 32 F.3d 989, 996 n.8 (6th Cir. 1994).

193.    Defendants Williams and McGrath were authorized to make official policy for the City on these issues.

194.    The City is liable under the First, Fourth, and Fourteenth Amendments via 42 U.S.C. § 1983.

195.    As a direct and proximate result of the City's unlawful activity, Plaintiff has suffered and continues to suffer economic and non-economic damages for which the City is liable.

196.    The City's acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter the City and others from engaging in this type of unlawful conduct.

## CLAIM 9
### MUNICIPAL *MONELL* LIABILITY, 42 U.S.C. § 1983—FAILURE TO TRAIN
### (AGAINST THE CITY OF CLEVELAND AND DEFENDANTS MCGRATH AND WILLIAMS)

197.    Plaintiff incorporates all previous allegations.

198.    "[A] city can be liable under § 1983 for inadequate training of its employees."[65]

199.    The City failed to provide adequate training to its officers on protestors' clearly established First Amendment rights to challenge civic or national pride with symbolic burnings, or protect their speech from interference by hecklers. Its training was not only inadequate, it was backwards: the City trained its officers to treat protected symbolic expression without differentiation as unprotected conduct, and extinguish it.

200.    In light of clearly established law, as well as the City's direct experience, the City's failure to train its officers displays deliberate indifference to the rights of persons they may encounter

201.    The City is liable under the First, Fourth, and Fourteenth Amendments via 42 U.S.C. § 1983.

---

[65] *City of Canton*, 489 U.S. at 388.

202.    As a direct and proximate result of the City's unlawful activity, Plaintiff has suffered and continues to suffer economic and non-economic damages for which the City is liable.

203.    The City's acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter the City and others from engaging in this type of unlawful conduct.

## CAUSES OF ACTION (STATE)

### CLAIM 10
### FALSE WRITINGS, OHIO REV. CODE § 2921.03(C)
### (AGAINST THE CITY DEFENDANTS)

204.    Plaintiff incorporates all previous allegations.

205.    Ohio Rev. Code § 2921.03(A)  provides that no person "shall attempt to influence . . . a public servant . . . by filing, recording, or otherwise using a materially false or fraudulent writing with malicious purpose, in bad faith, or in a wanton or reckless manner."

206.    Ohio Rev. Code § 2921.03(C)  provides a civil cause of action for violations of § 2921.03(A), and for the recovery of attorneys' fees and other expenses in bringing the civil claim.

207.    Defendants filed or submitted false writings in a reckless manner in an attempt to influence public servants to prosecute and convict Mr. Johnson, including by materially mischaracterizing Mr. Johnson's protected conduct, omitting material information about the supposed victims, and filing reports with unsupportable charges recklessly and in bad faith.

208.    Defendants caused damage to Mr. Johnson, including forcing him to incur stress and expenses defending himself from prosecution.

209.    As a direct and proximate result of Defendants' unlawful activity, Plaintiff has suffered and continues to suffer economic and non-economic damages for which Defendants are liable.

210.    Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter Defendants and others from engaging in this type of unlawful conduct.

### CLAIM 11
### FALSE WRITINGS, OHIO REV. CODE § 2921.03(C)
### (AGAINST THE INFOWARS DEFENDANTS)

211.    Plaintiff incorporates all previous allegations.

212.    Ohio Rev. Code § 2921.03(A)  provides that no person "shall attempt to influence . . . a public servant . . . by filing, recording, or otherwise using a materially false or fraudulent writing with malicious purpose, in bad faith, or in a wanton or reckless manner."

213.    Ohio Rev. Code § 2921.03(C)  provides a civil cause of action for violations of § 2921.03(A), and for the recovery of attorneys' fees and other expenses in bringing the civil claim.

214.    Defendants filed or submitted false writings with malicious purpose, in bad faith, and in a reckless manner in an attempt to influence public servants to prosecute and convict Mr. Johnson, including by fabricating accounts of injuries and submitting false medical reports.

215.    Defendants caused damage to Mr. Johnson including forcing him to incur legal expenses defending himself from prosecution.

216.    As a direct and proximate result of Defendants' unlawful activity, Plaintiff has suffered and continues to suffer economic and non-economic damages for which Defendants are liable.

217.    Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter Defendants and others from engaging in this type of unlawful conduct.

## CLAIM 12
### CIVIL LIABILITY FOR CRIMINAL ACTS UNDER OHIO REV. CODE § 2307.60 (A)(1) AND 2921.03(A)—FALSE WRITINGS
### (AGAINST THE CITY DEFENDANTS)

218.     Plaintiff incorporates all previous allegations.

219.     Under Ohio Rev. Code § 2307.60 (A)(1), "Anyone injured in person or property by a criminal act has, and may recover full damages in, a civil action," including attorneys' fees and punitive damages.

220.     Criminal statute Ohio Rev. Code § 2921.03(A)  provides that no person "shall attempt to influence . . . a public servant . . . by filing, recording, or otherwise using a materially false or fraudulent writing with malicious purpose, in bad faith, or in a wanton or reckless manner."

221.     Defendant, filed or submitted false writings in bad faith and in a reckless manner in an attempt to influence public servants to overlook their unlawful arrest and prosecute and convict Mr. Johnson in violation of his First Amendment rights.

222.     As a direct and proximate result of Defendants' unlawful activity, Plaintiff has suffered and continues to suffer economic and non-economic damages for which Defendants are liable.

223.     Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter Defendants and others from engaging in this type of unlawful conduct.

## CLAIM 13
### CIVIL LIABILITY FOR CRIMINAL ACTS UNDER OHIO REV. CODE § 2307.60 (A)(1) AND 2921.03(A)—FALSE WRITINGS
### (AGAINST THE INFOWARS DEFENDANTS)

224.     Plaintiff incorporates all previous allegations.

225.     Under Ohio Rev. Code § 2307.60 (A)(1), "Anyone injured in person or property by a criminal act has, and may recover full damages in, a civil action," including attorneys' fees and punitive damages.

226.    Criminal statute Ohio Rev. Code § 2921.03(A)  provides that no person "shall attempt to influence . . . a public servant . . . by filing, recording, or otherwise using a materially false or fraudulent writing with malicious purpose, in bad faith, or in a wanton or reckless manner."

227.    Defendants filed or submitted false writings in a reckless manner in an attempt to influence public servants to prosecute and convict Mr. Johnson, including by submitting false and fraudulent reports to induce the City to prosecute Mr. Johnson for his protected speech.

228.    As a direct and proximate result of Defendants' unlawful activity, Plaintiff has suffered and continues to suffer economic and non-economic damages for which Defendants are liable.

229.    Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter Defendants and others from engaging in this type of unlawful conduct.

### CLAIM 14
### CIVIL LIABILITY FOR CRIMINAL ACTS UNDER OHIO REV. CODE §§ 2307.60 (A)(1) AND  2921.12— TAMPERING WITH EVIDENCE
### (AGAINST THE CITY DEFENDANTS)

230.    Plaintiff incorporates all previous allegations.

231.    Criminal statute Ohio Rev. Code § 2921.12 provides that no person, knowing official proceedings are likely to be initiated, shall (1) "[a]lter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation," or (2) "[m]ake, present, or use any record, document, or thing, knowing it to be false and with purpose to mislead a public official who is or may be engaged in such proceeding or investigation, or with purpose to corrupt the outcome of any such proceeding or investigation."

232.    Defendants knew official proceedings were imminent, including the prosecution of Mr. Johnson.

233. Defendants knowingly removed evidence from the City's evidence locker, including a flash drive containing a body camera video and written statements, in order to affect the outcome of those proceedings.

234. Defendants' purpose was to procure an unlawful criminal verdict against Mr. Johnson.

235. As a direct and proximate result of Defendants' unlawful activity, Plaintiff has suffered and continues to suffer economic and non-economic damages for which Defendants are liable.

236. Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter Defendants and others from engaging in this type of unlawful conduct.

### Claim 15
### Civil Liability for Criminal Acts under Ohio Rev. Code §§ 2307.60 (A)(1) and 2921.12— Tampering with Evidence
### (Against the InfoWars Defendants)

237. Plaintiff incorporates all previous allegations.

238. Criminal statute Ohio Rev. Code § 2921.12 provides that no person, knowing official proceedings are likely to be initiated, shall (1) "[a]lter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation," or (2) "[m]ake, present, or use any record, document, or thing, knowing it to be false and with purpose to mislead a public official who is or may be engaged in such proceeding or investigation, or with purpose to corrupt the outcome of any such proceeding or investigation."

239. Defendants knew official proceedings were imminent, including the prosecution of Mr. Johnson.

240. Defendants knowingly presented false and misleading records to mislead public officials and corrupt the outcome of the sham prosecution, including by making false and misleading oral and written reports and submitting them to police officers.

241. Defendants' purpose was to procure an unlawful criminal verdict against Mr. Johnson.

242. As a direct and proximate result of Defendants' unlawful activity, Plaintiff has suffered and continues to suffer economic and non-economic damages for which Defendants are liable.

243. Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter Defendants and others from engaging in this type of unlawful conduct.

### CLAIM 16
### CIVIL LIABILITY FOR CRIMINAL ACTS UNDER OHIO REV. CODE §§ 2307.60 (A)(1) AND 2921.45—INTERFERENCE WITH CIVIL RIGHTS
### (AGAINST THE CITY DEFENDANTS)

244. Plaintiff incorporates all previous allegations.

245. Criminal statute Ohio Rev. Code § 2921.45 forbids public servants from depriving any person of a constitutional or statutory right.

246. Defendants acted under color of office, employment and authority to knowingly deprive Mr. Johnson of his civil rights, including his constitutional rights under the First and Fourth Amendments to the U.S. Constitution.

247. As a direct and proximate result of Defendants' unlawful activity, Plaintiff has suffered and continues to suffer economic and non-economic damages for which Defendants are liable.

248. Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter Defendants and others from engaging in this type of unlawful conduct.

### CLAIM 17
### CIVIL LIABILITY FOR CRIMINAL ACTS UNDER OHIO REV. CODE §§ 2307.60 (A)(1) AND 2921.13—FALSIFICATION
### (AGAINST THE INFOWARS DEFENDANTS)

249. Plaintiff incorporates all previous allegations.

250. Criminal statute Ohio Rev. Code § 2921.13 prohibits any person from making or swearing to previous false statements.

251.    Defendants knowingly made false statements in official proceedings, with the purpose to incriminate Mr. Johnson, and with a purpose to mislead public officials in the course of their official duties.

252.    As a direct and proximate result of Defendants' unlawful activity, Plaintiff has suffered and continues to suffer economic and non-economic damages for which Defendants are liable.

253.    Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter Defendants and others from engaging in this type of unlawful conduct.

### CLAIM 18
### CIVIL LIABILITY FOR CRIMINAL ACTS UNDER OHIO REV. CODE §§ 2307.60 (A)(1) AND 2921.44(E)—DERELICTION OF DUTY
### (AGAINST THE CITY DEFENDANTS)

254.    Plaintiff incorporates all previous allegations.

255.    Ohio Rev. Code § 2921.44(E) provides that "[n]o public servant shall recklessly fail to perform a duty expressly imposed by law with respect to the public servant's office, or recklessly do any act expressly forbidden by law with respect to the public servant's office."

256.    Defendants recklessly failed to perform duties expressly imposed on them by law, including protecting a lawful protestor, refraining from imposing prior restraints, and refraining from retaliation against lawful speech.

257.    Defendants recklessly performed acts expressly forbidden by law, including imposing unlawful prior restraints on Mr. Johnson's speech and retaliating against Mr. Johnson for criticizing the United States.

258.    As a direct and proximate result of Defendants' unlawful activity, Plaintiff has suffered and continues to suffer economic and non-economic damages for which Defendants are liable.

259.    Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter Defendants and others from engaging in this type of unlawful conduct.

## CLAIM 19
### MALICIOUS CRIMINAL PROSECUTION
### (AGAINST THE CITY DEFENDANTS)

260.    Plaintiff incorporates all previous allegations.

261.    Defendants maliciously instituted the criminal prosecution of Mr. Johnson, without

probable cause, and it was terminated in Mr. Johnson's favor.

262.    Defendants maliciously continued to prosecute Mr. Johnson in the absence of probable

cause, and it was terminated in Mr. Johnson's favor.

263.    Defendants' malicious prosecution of Mr. Johnson caused him irreparable harm.

264.    As a direct and proximate result of Defendants' unlawful activity, Plaintiff has suffered and

continues to suffer economic and non-economic damages for which Defendants are liable.

265.    Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to

punish and deter Defendants and others from engaging in this type of unlawful conduct.

## CLAIM 20
### REPLEVIN
### (AGAINST THE CITY OF CLEVELAND)

266.    Plaintiff incorporates all previous allegations.

267.    Mr. Johnson is the owner of the flag.

268.    Notwithstanding the termination of criminal proceedings against him by acquittal at trial,

the City did not return it to him.

269.    Mr. Johnson is entitled to possession of his flag, and a declaration that continued

impoundment of his property is unlawful.

270.    As a direct and proximate result of Defendants' unlawful activity, Plaintiff has suffered and

continues to suffer economic and non-economic damages for which Defendants are liable.

271.    Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter Defendants and others from engaging in this type of unlawful conduct.

### PRAYER FOR RELIEF

Mr. Johnson thus respectfully requests that the Court:

1.    Enter judgment in Mr. Johnson's favor on all claims for relief;

2.    Declare that Defendants' acts, omissions, and conduct constitute violations of the First, Fourth and Fourteenth Amendments to the United States Constitution, as well as of 42 U.S.C. § 1983.

3.    Award injunctive relief enjoining Defendants from further unlawful application of Ohio law, and requiring Defendants to conduct adequate and specific training on protecting symbolic speech, including how to protect those who may wish to protest by burning the flag, and how to avoid unlawfully arresting them.

4.    Order Defendants to return Mr. Johnson's flag;

5.    Declare that Defendants are liable for damages on all claims for relief;

6.    Award full compensatory damages, including but not limited to damages for pain and suffering, mental anguish, emotional distress, humiliation, embarrassment, and inconvenience that Mr. Johnson has suffered and is reasonably certain to suffer;

7.    Award punitive and exemplary damages for the individual Defendants' intentional, malicious, and egregious acts and callous and reckless disregard of Mr. Johnson's constitutional rights;

8.    Award pre- and post-judgment interest at the highest lawful rate;

9.    Award Mr. Johnson his reasonable attorneys' fees and all other costs of suit available under 42 U.S.C. § 1988 and Ohio Rev. Code 2921.03(C); and

10.     Award all other relief in law or equity, including injunctive relief, to which Mr.

Johnson is entitled and that the Court deems equitable, just, or proper.

## JURY DEMAND

Mr. Johnson demands a trial by jury on all issues within this Complaint.

Respectfully submitted,

*/s/ Subodh Chandra*
Subodh Chandra (OH Bar No. 0069233)
Patrick Kabat (NY Bar No. 5280730)
Donald P. Screen (OH Bar No. 004070)
Patrick Haney (OH Bar No. 092333)
THE CHANDRA LAW FIRM LLC
The Chandra Law Building
1265 W. 6th St., Suite 400
Cleveland, OH 44113-1326
216.578.1700 Phone
216.578.1800 Fax
Subodh.Chandra@ChandraLaw.com
Patrick.Kabat@ChandraLaw.com
Donald.Screen@ChandraLaw.com
Patrick.Haney@ChandraLaw.com

*Attorneys for Plaintiff Gregory Lee Johnson*